IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BRIAN C. CURLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-624-GMS |
| | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

## I. INTRODUCTION

This case comes from the denial of Brian C. Curley's ("Curley") claim for Social Security disability benefits. Curley, the plaintiff, applied for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act") on April 29, 2004. Title II, 42 U.S.C. §§ 401-33 (2008). In his application, he claimed that he became disabled due to depression on July 11, 2003. (Tr. at 93.) After the Commissioner denied the application initially and on reconsideration, Curley requested a hearing before an Administrative Law Judge ("ALJ"). (Id. at 87.) Curley, represented by counsel, appeared at the November 21, 2005 hearing. Following the hearing, on January 7, 2006, ALJ Clay G. Guthridge issued a written opinion denying Curley's application for disability benefits. Specifically, ALJ Guthridge found that, although Curley could not perform his past relevant work, he retained the capacity to perform other jobs that existed in the regional economy. (Id. at 15-28.) Curley requested a review of the ALJ's decision by the Appeals Council, which denied review on August 18, 2006. Upon that denial, the Commissioner's decision became final. (Id. at 5-7.)

On October 6, 2006, Curley filed a timely appeal with this court. (D.I. 1.) Currently before the court are the parties' cross-motions for summary judgment. Because the court finds that the ALJ's decision does not meet the substantial evidence test, it will deny the Commissioner's motion for summary judgment, grant Curley's motion for summary judgment, and reverse the decision of the ALJ, pursuant to sentence four of 42 U.S.C. § 405(g).[1]

## II.   BACKGROUND

Curley, 54 years old on the date of the hearing before the ALJ, has completed college and graduate school, earning a Masters Degree in Business Administration from the University of Michigan. (Tr. at 232.) Prior to the onset of the alleged disability, Curley worked as a financial manager, a company treasurer, and as a senior associate at a CPA/consulting firm. (Id. at 99.) Curley resigned from his last position on July 11, 2003, allegedly due to "depression and deteriorating health." (Id. at 111.)

### A.   Medical Evidence

Curley does not contest the ALJ's findings regarding his physical ability to work. Accordingly, the court will focus on evidence of his mental impairments. On December 2, 2003, Curley sought treatment for depression from his family physician, Hugh Bonner III, M.D. ("Dr. Bonner"). Dr. Bonner diagnosed Curley with depression of moderate severity, anxiety, and features of obsessive-compulsive disorder. (Id. at 178.) He began treating Curley with antidepressants and anti-anxiety medication. (Id.) Dr. Bonner's treatment records reveal statements made by Curley at that first visit, notably, Curley's report that his symptoms of depression dated back to 1986. Curley also reported that his self-esteem and energy level were

---

[1] Sentence four states that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

low, his sleeping was "awful," and his appetite was "non-existent." (Id.)  Dr. Bonner noted that Curley weighed 141 pounds on the date of that visit. (Id.)  Curley continued to see Dr. Bonner for medication follow up visits through September 2005. (Id. at 237.)  Dr. Bonner's treatment notes indicate that Curley's depression stabilized with medication and that his weight, accordingly, increased to its normal range of 165-175 pounds. (Id. at 44.)

In May 2004, Curley began weekly therapy with Steven R. Levine, Ph.D. ("Dr. Levine"), who was Curley's treating psychologist at the time of the hearing before the ALJ.[2]  Dr. Levine completed a Psychological Functional Capacities Evaluation for the Delaware Disability Determination Service ("the state agency") on July 28, 2004, which was approximately two months after he first began treating Curley and approximately a year after the alleged onset of the disability.  In that report, Dr. Levine noted "moderate" impairment in Curley's ability to relate to other people, "no" restriction of daily activities, "mild" deterioration of personal habits and "moderately severe" constriction of interests. (Id. at 179.)  Regarding the competitive labor market, Dr. Levine noted that Curley suffers from a "moderately severe" impairment in his ability to sustain work performance and attendance, and to cope with pressures of ordinary work. (Id. at 180.)

On August 30, 2004, Eugene O'Malley, M.D. ("Dr. O'Malley) completed Mental Residual Functional Capacity Assessment and Psychiatric Review Technique checklist forms as a consultant to the state agency.  Dr. O'Malley did not examine Curley.  Instead, he completed the forms after reviewing unspecified medical evidence in Curley's record at the request of the state agency.  Dr. O'Malley found Curley to be "moderately limited" in his ability to understand, remember, and carry out detailed instructions, as well as his ability to interact appropriately with

---

[2] By November 2005, Dr. Levine estimated that Curley's treatment spanned 62 sessions. (Tr. at 232.)

the general public.  (Id. at 189-90.)  He noted "moderate" limitation in maintaining social functioning and stated that Curley "cannot work with [the] public."  (Id. at 191.)  He also wrote that Curley had only "one month of a documented mental disorder."  (Id. at 190-91, 202.)

Dr. Levine also completed an evaluation on March 14, 2005 for the Delaware Disability Determination Service.  This report documents his diagnosis of major depression and post-traumatic stress disorder.  (Id. at 206-08.)  According to this report, Curley suffered from "lack of self-care and self-interest, major feelings of depression and hopelessness, feeling useless and kind of hopeless about the future."  (Id. at 206.)

On April 13, 2005, Christopher King ("King"), a consultant to the state agency who did not treat or examine Curley, completed Mental Residual Functional Capacity Assessment and Psychiatric Review Technique checklist forms at the request of the agency.  King reported that Curley is "moderately limited" in the "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  (Id. at 224.)

In August 2005, Dr. Levine completed a Mental Impairment Questionnaire in support of Curley's claim for benefits.  In the report, he indicated that Curley's symptoms of depression[3] would keep him out of work more than three times a month.  (Id. at 228.)  Following up on that report, Dr. Levine submitted an additional psychological evaluation report to the ALJ, dated November 16, 2005.  (Id. at 232-36.)  In that report, he diagnosed Curley's impairment as severe major depression and post-traumatic stress disorder.  (Id. at 236.)  He noted that Curley's mood

---

[3] Symptoms noted are: appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, emotional lability, recurrent panic attacks, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, obsessions or compulsions, intrusive recollections of traumatic experience, and generalized persistent anxiety.  (Tr. at 227.)

4

varied "from session to session. At times he is seriously depressed and at other times subdued, but more animated and engaging." (Id. at 234.) Additionally, Dr. Levine wrote that Curley "is oriented to time, person and place. His attention, concentration, and memory are all intact. He is highly intelligent. In contrast, his social judgment is often impaired. . . ." (Id.) Dr. Levine noted that, due to treatment, Curley's "mood has become somewhat more stable. He has developed some skills to cope with feelings of anxiety and depression. . . ." (Id.) However, Dr. Levine concluded with his opinion that Curley "does not have the emotional strength or emotional resources to cope with the interpersonal demands of a gainful employment situation." (Id. at 236.)

## B.    Hearing Testimony

### 1.    Curley's Testimony

At the hearing before the ALJ, Curley testified that the onset of his alleged disability occurred on July 11, 2003, which was the day that he resigned from his last position of employment. He stated that he was very concerned with his physical health and, with regard to the job itself, he "couldn't deal with it any longer." (Id. at 43.) Curley testified that his perception of his employer's lack of appreciation for his value resulted in a level of stress that became too difficult for him to handle. (Id. at 49.) He testified that the situation had gotten to the point that he had to "take walks during the day just to take deep breaths." (Id.) Curley sought other employment that would involve less stress for about six months after he resigned, but was unable to find employment. He felt that the unsuccessful job search contributed to the "downward spiral." (Id. at 53.)

Because of his condition, Curley sought treatment for depression with Dr. Bonner in December 2003. Dr. Bonner prescribed Zoloft. (Id.) In March 2004, which Curly described as

5

"the lowest point where [he] really couldn't get out of bed," Curley began therapy with Dr. Levine. (Id. at 51.) About that same time, he halted his job search to "focus on getting better as quickly as [he] could." (Id. at 54.) In November 2004, Curley began to volunteer at A.I. DuPont Hospital for Children. In December of that year, he also began volunteering with a non-profit organization called Kin Folk. (Id.)

Curley described his responsibilities at the children's hospital as generally helping the families of patients settle in, explaining the hospital rules, helping them get things such as chairs and glasses of water, and occasionally entertaining the other children in the family. (Id. at 56-57.) He described his responsibilities with Kin Folk as collecting issued lap top computers and reissuing them to families with sick children. (Id. at 55, 57-58.) In response to questions posed by his attorney and follow up questions by the ALJ, Curley testified that he occasionally had trouble with patients' family members, who in his view became rude when he was unable to meet their expectations. (Id. at 59-60.) He stated that, when that happened, he experienced "feelings of sadness," but that "[u]sually by the next day [he was] okay and . . . past it but there are situations like that that can be quite bothersome to [him]." (Id.) Curley estimated that he worked between 40 to 50 hours per week in his volunteer positions, and had been doing so since February or March 2005. (Id. at 56.)

### 2.  Vocational Expert Testimony

At the same hearing before the ALJ, a Vocational Expert (the "VE") classified Curley's previous positions as sedentary and skilled, and stated that the skills needed for those positions were transferrable to semi-skilled positions. (Id. at 63.) The VE testified that a hypothetical

6

person with Curley's age, education, and work history who had a mental impairment[4] preventing all but those jobs involving "simple tasks and instruction" would not be able to perform any of Curley's previous jobs. (Id. at 64.) The VE further testified that there were unskilled positions existing in significant numbers in the national and regional economy that this hypothetical person could perform. (Id. at 218-19.) The positions identified by the VE as meeting these criteria are packer, mail clerk, and order clerk. (Id. at 64.)

Next, the ALJ asked the VE to consider a hypothetical individual with Curley's attributes who had the ability to do volunteer work similar to the work done by Curley. (Id. at 64-65.) The VE asked if she were to "consider all of the limitations that he testified [about]," to which the ALJ replied, "Let me rephrase it." (Id. at 65.) The ALJ then directed the VE to consider "the volunteer work that [Curley] described that he's been doing at the hospital in the NICU and for Kin Folk. . . . Would that hypothetical individual be able to perform the jobs that you just described?" (Id.) The VE then gave her opinion that this hypothetical individual would be able to perform the above-described jobs. (Id.)

Curley's attorney then directed the VE to consider the Mental Impairment Questionnaire prepared by Dr. Levine (id. at 227-31), and asked the VE the following questions:

> Q: If I could call your attention to three items on[,] I guess[,] the third page, one is number 9, the other [number] 12 and the other [number] 15, all of which are [marked] poor to none. One is complete a normal workday and workweek without interruption from psychologically based symptoms. The other, accept instructions and respond appropriately to criticism from supervisors. And the third, deal with normal work stress. Would you agree with me that those are probably the three most important areas to consider when considering a psychologically based impairment and its effect on someone's ability to work in a competitive environment?
> VE: I would agree.

---

[4] The court notes that the term "mental impairment" used here describes the ALJ's conclusion of Curley's residual functional capacity, not the specific medical findings of impairment.

Q: And the fact that those three areas are marked poor to none, does that lead you to conclude that if a hypothetical individual with these limitations, or [one who] had these limitations[,] that they would not be able to perform any jobs in the economy?
VE: I would agree.
Q: Including those jobs that you mentioned previously?
VE: Yes.

(Id. at 66.)

Curley's attorney next directed the VE's attention to the Psychological Functional Capacities Evaluation Form completed by Dr. Levine for the Delaware Disability Determination Service on July 28, 2004 (id. at 179-180), and asked the VE the following question:

Q: I would point out that there are three particular areas [of concern], one is question 4, which is restriction of interest marked moderately severe, but the more important ones I want to focus on would be number 10 and number 11, sustain work performance and attendance in normal work setting and cope with pressures of ordinary work, i.e., meeting quality and production norms. Now both of them are marked as moderately severe and at the bottom of that page you see that definition that moderately severe as an impairment [is one] which seriously affects the ability to function. I guess the question is, if someone had those limitations would that preclude them from any type of work in the economy?
VE: I would say yes.

(Id. at 67.) In answer to further questions by the ALJ, the VE offered the opinion that any single limitation taken alone would not preclude employment. (Id.)

### C.   The ALJ's Findings

Based on the medical evidence, and the testimony of the claimant and the VE, the ALJ determined that Curley's depression did not prevent him from engaging in substantial gainful employment and, thus, did not constitute a disability within the meaning of the Act. (Id. at 21-22.) In his written opinion, the ALJ documented his findings at each of the five steps mandated by 20 C.F.R. § 404.1520.

Under that five-step analysis, the [Commissioner] determines first whether an individual is currently engaged in substantial gainful activity. If that individual is engaged in substantial gainful activity, he will be found not disabled regardless of

8

the medical findings. 20 C.F.R. § 404.1520(b). If an individual is found not to be engaged in substantial gainful activity, the [Commissioner] will determine whether the medical evidence indicates that the claimant suffers from a severe impairment. 20 C.F.R. § 404.1520(c). If the [Commissioner] determines that the claimant suffers from a severe impairment, the [Commissioner] will next determine whether the impairment meets or equals a list of impairments in Appendix I of sub-part P of Regulations No. 4 of the Code of Regulations. 20 C.F.R. 404.1520(d). If the individual meets or equals the list of impairments, the claimant will be found disabled. If he does not, the [Commissioner] must determine if the individual is capable of performing his past relevant work considering his severe impairment. 20 C.F.R. § 404.1520(e). If the [Commissioner] determines that the individual is not capable of performing his past relevant work, then she must determine whether, considering the claimant's age, education, past work experience and residual functional capacity, he is capable of performing other work which exists in the national economy. 20 C.F.R. § 404.1520(f).

*Brewster v. Heckler*, 786 F.2d 581, 583-84 (3d Cir. 1986). After reviewing the evidence, the ALJ

determined that Curley "has had the following severe impairment: depression." (Tr. at 20, Finding

No. 3.) The ALJ further found that Curley's non-exertional limitations prevented him from

returning to his past employment. (Id. at 23, Finding No. 6.) The ALJ also found, however, that

Curley retained the capacity to perform any unskilled job without any exertional limitations. (Id.

at 21, Finding No. 5.) Moreover, the ALJ found that this work, such as a packer, mail clerk, or

order clerk, existed in significant numbers in the national and regional economy. (Id. at 24,

Finding No. 10.) Therefore, the ALJ concluded that Curley was not disabled within the meaning

of the Act.

## III.   STANDARD OF REVIEW

### A.   Motion for Summary Judgment

Both parties to this case filed motions for summary judgment pursuant to Federal Rule of

Civil Procedure 56(c). In determining the appropriateness of summary judgment, the court must

"review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving

party[,]' but [refrain from] weighing the evidence or making credibility determinations. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted). If the court is able to determine that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *Hill v. City of Scranton*, 411 F.3d 118, 25 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).

**B.    Review of ALJ's Findings**

The court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." See 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence does not mean a large or a considerable amount of evidence. *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S. Ct. 2541, 101 L.Ed.2d 490 (1988) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938)). Rather, it has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).

Credibility determinations are the province of the ALJ, and should only be disturbed on review if not supported by substantial evidence. *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *2 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 973 (3d Cir. 1983)). Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). In social security cases, this substantial evidence standard applies to motions for summary judgment brought pursuant to Fed. R. Civ. P. 56(c). *See Woody v. Sec. of the Dep't of Health & Human Serv.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

10

## IV.     DISCUSSION

In this appeal, Curley argues that the Commissioner did not have substantial evidence to support the denial of disability benefits. Curley makes four arguments in support of this claim: (1) that the ALJ failed to give proper weight to evidence presented by his treating physician, Dr. Levine; (2) that the ALJ posed improper questions to the VE in that he omitted some of Curley's limitations; (3) that the ALJ's reliance on the opinion of the VE was not supported by the evidence; and (4) that the ALJ erred when he failed to obtain a medical opinion upon receipt of additional reports from Curley's treating medical provider. (D.I. 9.)

After having considered the parties' arguments and submissions, the court agrees with Curley that the ALJ improperly discredited Dr. Levine's opinions and reports. The statutory standard for considering a treating physician's opinion clearly establishes that if a "treating source's opinion on the issue(s) of the nature and severity of the [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimants] case record, [the Commissioner] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). The Court of Appeals for the Third Circuit addressed the issue of appropriate weight to be given to opinions of treating physicians in *Plummer v. Apfel*, 186 F.3d 422 (1999), where it wrote that "treating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" 186 F.3d at 429 (quoting *Rocco v. Heckler*, 826 F.2d 348, 1350 (3d Cir. 1987)). In the event that the record contains conflicting evidence, "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Plummer*, 186 F. 3d at 429 (quoting *Mason v. Shalala*, 994 F.

11

2d 1058, 1066 (3d Cir. 1993)).[5]  In order to reject a treating source's opinion outright, the ALJ

must base the rejection on contradictory medical evidence, and "not due to his or her own

credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d

Cir. 2000) (citing *Plummer*, 186 F.3d at 429).

Here, the ALJ gave "minimal weight" to Dr. Levine's opinion that Curley was not capable

of gainful employment, stating that Dr. Levine's psychological report dated November 2005, did

not support that opinion.  (Tr. at 22.)  In support of his ruling, the ALJ cited several statements

from that report.    The ALJ's written opinion, however, misstated Dr. Levine's findings.[6]

Similarly, the ALJ referred to statements in Dr. Levine is Mental Impairment Questionnaire, dated

March 2005 (id.), but used the statements in a manner that contradicts Dr. Levine's own answers

to the evaluations.[7]  The ALJ provided these misstatements and mischaracterizations as his reasons

for rejecting Dr. Levine's opinion evidence.  Given the foregoing, the ALJ rejected the opinion of

the treating provider for no reason, or the wrong reason.

The ALJ also discredited Dr. Levine's finding of marked limitations on Curley's ability to

maintain social functioning, stating that there was no evidence to support the finding, and that

Curley's volunteer work contradicts that finding.    (Id.)    According to Dr. Levine, however,

---

[5] *See* C.F.R. § 404.1527 (d) (among other factors, the commissioner should evaluate medical sources based on the treatment relationship, including length and frequency of treatment, nature and extent of treatment, the degree to which the opinion is supported by clinical findings and is consistent with other evidence in the record, and the degree of specialization of the treating source).

[6] For example, Dr. Levine wrote that Curley's mood has "become somewhat more stable" (tr. at 235); the ALJ wrote that his "mood has stabilized" (id at 22) which, clearly, is not the meaning intended by Dr. Levine. Additionally, Dr. Levine wrote that Curley had developed some skills to cope. . ." (id. at 235), but the ALJ found that Curley "has developed skills for coping. . ." (id. at 22).

[7] For example, the ALJ wrote, "Dr. Levine's responses on the Mental Impairment Questionnaire indicate that the claimant could function very well in an unskilled position dealing with simple instructions." (Id. at 22.) It is difficult to understand how the ALJ could have come to that conclusion when reading the Mental Impairment Questionnaire, considering that Dr. Levine answered "poor to none" when asked to evaluate Curley's ability to deal with the normal work stress of unskilled work. (Id. at 229.)

Curley's volunteer work is not proof of adequate social functioning, but a response to his fear of and inability to maintain personal relationships. (Id. at 235.) Both non-examining consultants acknowledged some level of difficulty in this area, with Dr. O'Malley stating that Curley "cannot work with the public," (id. at 191), and King finding a "mild" limitation in Curley's ability to maintain social functioning, (id. at 219). The record here reveals no evidence that contradicts Dr. Levine's finding of marked impairment in social functioning. In fact, although they do not reach as far as Dr. Levine's opinion, the medical conclusions of both non-examining consultants support, rather than contradict, Dr. Levine's opinion. Because there was no conflicting evidence in the record, the ALJ erred when he did not give Dr. Levine's opinion controlling weight.

Finally, the ALJ discredited Dr. Levine's opinion because he did not explain how Curley could have the "ability" to do volunteer work but not paid work. (Id. at 22.) Although Dr. Levine did not elaborate on the difference between Curley's ability to perform volunteer work and Curley's ability to perform paid work, he did address the level of interpersonal functioning necessary for paid employment, and provided his opinion as to Curley's fitness in that area. (Id. at 235.) The fact that Dr. Levine's report did not address, generally, the differing emotional requirements of paid and volunteer employment seems a questionable basis for rejecting Dr. Levine's evidence. If the ALJ wished to know why Curley could apparently do one and not the other, he could, and should, have asked Curley that question himself while he was under oath. Further, the record does not contain any evidence that suggests that an "ability" to do one equates with an ability to do the other.[8] Nor does the record contain evidence that Curley has been successful in his volunteer positions. The ALJ ignored the supported medical observations and

---

[8] The court notes that there are factual differences between paid employment and volunteer work that may result in different levels of associated stress. For instance, attendance at paid employment is mandatory, whereas attendance at a volunteer position is, by definition, not mandatory. Additionally, while areas of overlap may exist, generally the motivation to perform paid work is different from the motivation to volunteer.

opinions of the treating medical provider in favor of his own conclusion, based solely on his speculative inference that because Curley was able to perform volunteer work he must also be able to perform paid work. Accordingly, because substantial evidence supporting Dr. Levine's opinion exists, the ALJ erred when he disregarded this evidence and substituted his own speculative inference.

For the reasons stated above, the court finds that the ALJ improperly discredited Dr. Levine's evidence. As a result, the VE was not able to credit Curley's limitations when considering the employment potential for a hypothetical individual with Curley's attributes. When a VE has determined that work exists within the capability of the claimant to perform, "in order for a vocational expert's testimony to constitute 'substantial evidence' that such work exists, the ALJ's hypothetical question must adequately convey all the claimant's limitation-causing impairments." *Holmes v. Astrue*, Civil Action No. 08-545, 2009 WL 688914, at *12 (W.D. Pa. March 12, 2009) (citing *Ramirez v. Barnhart*, 372 F.3d 546, 552-55 (3d Cir. 2004)).

Here, when the ALJ asked the VE to consider a hypothetical individual with Curley's attributes, he improperly described his *conclusion* about Curley's limitations, rather than directing the VE to consider Curley's specific work-related impairments.[9] (Tr. at 63-64.) Thus, he described a person who, "because of his depression, would only be able to handle jobs with simple tasks and instruction." (Tr. at 63-64.) When the VE asked the ALJ if he meant that she was to consider "all the limitations that he testified [to,]" the ALJ did not respond in the affirmative, but rephrased the question to focus the VE's attention on Curley's volunteer work. (Id. at 65.) Because the ALJ did not give the VE instructions to consider Curley's specific limitations, the ALJ erred by relying on that opinion.

_____

[9] Which, for example, would include Dr. Levine's finding of Curley's impaired social functioning and King's opinion that Curley is moderately limited in his ability to complete a normal workday, discussed *supra*.

The evidence adduced at Curley's hearing demonstrates that he is not capable of performing his past relevant work. The burden, therefore, shifts to the Commissioner to prove that jobs exist in the economy that Curley is capable of performing. In order to carry this burden, the Commissioner must determine what work Curley can perform, and whether those jobs are available. The ALJ determined that Curley was capable of unskilled work, despite substantial evidence to the contrary, based on Curley's ability to maintain a volunteer position. It is clear from the record, however, that Curley's ability to handle stress is at issue here, rather than his relative skill level. There is no evidence in the record that a job classification of "unskilled" equates to one of "low stress." Nonetheless, the ALJ clearly questioned the VE with the assumption in mind that unskilled work necessarily involves a reduced stress level. The VE's testimony regarding available jobs necessarily took into account the ALJ's unsupported assumption. It follows then that the VE's conclusions as to job availability did not take into account Curley's actual limitations. As a result, the court finds that the Commissioner has not identified jobs that Curley is able to perform. Thus, the Commissioner has not met the burden of proving that such paid employment exists within the national and local economies.

## V.    CONCLUSION

For the foregoing reasons, and in the absence of evidence in the record that Curley can engage in gainful employment, the court concludes that ALJ Guthridge's denial of disability benefits was not based on substantial evidence. The court further finds that the record is fully developed, and that nothing, therefore, would be added by remanding this matter for a rehearing. Accordingly, the court will deny the Commissioner's motion for summary judgment, grant

15

Curley's motion for summary judgment, and direct the Commisioner to award disability benefits to Curley as of July 11, 2003.

Dated: March 27, 2009

_____
CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRIAN C. CURLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 06-624-GMS |
| | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY

ORDERED that:

1.    The plaintiff's motion for summary judgment (D.I. 8) is GRANTED.

2.    The defendant's motion for summary judgment (D.I. 10) is DENIED.

3.    The Commissioner is DIRECTED to grant disability benefits to Curley as of July

11, 2003.

4.    The Clerk of Court is directed to close this case.

Dated: March 27, 2009

CHIEF UNITED STATES DISTRICT JUDGE